466 A.2d 885

**In re JERTRUDE O., Raissa O., Letycia O.**

**No. 1908, Sept. Term, 1982.**

Court of Special Appeals of Maryland.

Oct. 17, 1983.

Certiorari Denied Jan. 11, 1984.

84

**86**

Martha Weisheit, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on brief, for appellants.

Paul A. McGuckian, County Atty. for Montgomery County, with whom were Robert G. Tobin, Jr., Deputy County Atty. for Montgomery County and Alan M. Wright, Asst. County Atty. for Montgomery County, on brief, for appellee.

Argued before GILBERT, C.J., and LOWE and LISS, JJ.

LOWE, Judge.

A "[c]hild in need of assistance" is one who is not receiving ordinary and proper care and attention *and* whose parents are unwilling or unable to so provide the child and his problems. Md.Cts. & Jud.Proc.Code Ann. § 3–801(e). Although the statute provides the measure by which a judge must determine whether a child is receiving such care and attention, Cts. & Jud.Proc. § 3–819(d),[1] the juvenile causes subtitle does not suggest what is proper or what is ordinary.

---

1. "[T]he allegations must be proved by a preponderance of the evidence."

Presumably, the judge is expected to make that determination evidentially and empirically.

A judge in the Juvenile Division of the District Court of Montgomery County was called upon to determine whether the "ordinary" customs and mores of Central African Republic parents in raising their children were "proper" when permitted or performed in America. He decided that they were not; and because one of three daughters had bruises and scarring of skin and bone unsatisfactorily explained to him, he declared all three of appellants' children in need of assistance. The oldest daughter, four-year-old Jertrude, had been taken from her parents pursuant to § 3–815(b) prior to the adjudicatory hearing, and at disposition shelter care in a private home was continued presumably pursuant to § 3–820(b)(2) (now (c)(2)) (1982 Cum.Supp.).

Jertrude's father was employed as a chauffeur at the Central African Republic's embassy which paid him neither substantially nor regularly. As a result, his family's shelter was nomadic, occasionally shared and barely adequate. Except for whatever inferences could be drawn from Jertrude's scars and her occasional seeming withdrawal from her parents following their six month long separation, there was no evidence at all that her parents were other than loving and caring ones. Although some suspicion by reason of primary custody focused upon the mother as the source of Jertrude's injuries, extensive and repeated examinations and investigations in home and out, individually and familially, physically, psychiatrically, socially and judicially by the Montgomery County Department of Social Services unearthed nothing that would indicate abuse. Indeed, quite the contrary was pointedly indicated in the sensitive and perceptive observations following examination of the mother by the Department's Psychiatrist, Rosalie Barr, noted in the Department's evaluation update prior to the disposition from which this appeal was taken.

"There were no signs of the characterological defects (impatience, easy frustration, inability to stay on task, detached effect, minimizing, evasive or paranoid flavor,

etc. etc.), which would predispose to abuse. Her suffering at the emotional as well as physical loss of Jertrude revealed her valuation of and attachment to the child . . . ."

Because the father spoke English haltingly and the mother not at all, their attempt to explain the possible cause of current bruises, old healed-over hairline bone fractures and epidermal scars on Jertrude was, to state the obvious, unconvincing to the judge who decided that the injury residuals evidenced by pictures and x-rays could not have occurred if "the parents were in any way caring for the child or . . . or alert to the child's care."

While the judge recognized the absence of evidence of parental child abuse and realized that he could not apply a res ipsa loquitur rationale, he came dangerously close to doing just that.

"[I]t would be the Court's opinion that any child who has been the subject of physical abuse by one or both parents, is an example of a child who is not receiving ordinary proper care and attention and it would follow, in my view, that the parents would be, in that context, unwilling or unable at least to give proper care and attention of . . . if there was concern there would be some . . . at least if there was some concern, that they . . . there would be ongoing . . . ongoing mistreatment if the child were to remain in the home of the parents. We do have injuries that have in a sense been unexplained. Explained by the parents. Unexplained in the view of the . . . medical and other professional people involved."

But absent the physical fact of the scarring and an interpretation of those scars by a medical doctor employed by the Montgomery County Health Department who had "had occasion to actually . . . look at [Jertrude's] body", but who did not "give her [a] full medical, physical examination", there was no evidence that anyone had abused Jertrude, much less her parents.

Ironically, the finding that the parents had not provided ordinary or proper care *and* were unwilling or unable to do

so emanated from their having taken the child to a hospital for treatment of an injury discovered by the mother when bathing the child. The numerous fine cut-like scars and circular marks on her body prompted the doctor to x-ray and more carefully examine the child. He then reported what appeared from the examination to be a "battered" child as he is required to do.

When called upon to explain the source of these bruises and scars, etc., the parents (ultimately through an interpreter), although not professing to know precisely when each old injury occurred, explained that the child continuously climbed and fell from furniture and in her bathtub, and pointed to specific episodes which may have caused bruises and the unexplained old injuries. This was substantiated by the County's evaluation report noting that Jertrude was still noticeably bruised ten weeks after she had been removed from her parents' custody. The update report also noted her continued propensity at her foster home to climb upon dressers, sofa, top of her closet and banisters as well as the bathtub.

They explained her skin scars as best they could from the nature of the scars. There were apparently three types of scars or marks on the child's body as revealed in photographs submitted and as described by the Health Department doctor who had "looked at" Jertrude's body.

"DR. FRANKEL: I saw a child who was covered with scars. From . . . extending from . . . the neck to . . . her toes essentially, from her . . . the whole back, her bottom, the front and back of her body had numerous scars on that. There were a few scars on her face but not significant the ones that I saw on the body.

COURT: Did you say arms and legs or . . .

DR. FRANKEL: Yes.

COURT: Arms and legs including the torso as well?

DR. FRANKEL: Yes.

MR. WRIGHT: Now, when you say a scar, what do you mean by a scar?

DR. FRANKEL: I am describing what is ... the residual of an injury. It's ... a tissue reaction. And ... she had different types of scars. She had scars with which showed hypopigmentation and body reaction and she also showed areas where it appeared that the dermis, the full thickness of the skin, was missing and healed and that (Unclear).

Q: What would be the difference between this area that had hypopigmentation and the one with depigmentation? What ...

A: It depends on the extent of the injury. Tissue reaction usually occurs in ... and you can have particularly ... in people with dark pigmentation ... dark skin, hypopigmentation, an over reaction of the ... the layers of the skin. If the full thickness of the skin is removed, then you end up with no pigmentation, therefore you have these white marks. White scars. I think ... "

The mother, who appeared to have taken the skin condition more or less for granted, explained that the straight and curved scars on the legs and buttocks could have come from the tall grasses in the fields occasionally, if not frequently, traversed by Jertrude in Africa from which they had recently arrived. The larger, coarser scars on her neck and body probably were caused by scabies, a common skin parasite prevalent in the Central African Republic. Scabies are itch mites which bore beneath the skin and cause intense itching and eczema aggravated by scratching. The circular or oval marks were made by "cupping", a procedure explained by African experts as a customary quasi-medical procedure in which the hollow end of a cow horn is heated and then pressed against the body to create a suction effect presumably to withdraw whatever evils are causing a current sickness.

Dr. Frankel, the Health Department pediatrician who had looked at Jertrude's body, suggested different explanations. She could conceive of no "medical" explanation for the scars, but indicated that the elongated cut-like marks were

". . . marks that I have seen being inflicted by . . . a child being whipped with an instrument";

presumably such as a

"twig which is looped, a green stick kind of thing or a . . . something like a belt with a harder impression at the edges and therefore I'm going that the configuration is . . . I . . . my tendency is to think of something that was looped. And then inflicted in that fashion."

The oval marks, she said were

"very reminiscent of human bites, of adult human bites, rather than a child's human bite."

She did not, however, have "a clear cut explanation" of other marks on the neck.

She conceded that some of these marks could have been caused by skin diseases or skin rashes prevalent in Africa but discounted as unlikely that "cupping" could have caused the oval marks because the person administering the "worthless" procedure would have to handle the heated horn and, therefore, "would sustain the burn as well." How the customary procedure was performed in Africa without similar injury to the administrant was not addressed.

Finally, she conceded that she did not see any bruising, perhaps because of the dark pigmentation of the child, although the hospital history initially had reported bruises on the child.

Based upon these expert conjectures, photographs of the child and the Department's initial emphatic recommendation that

"[t]his child should not return home under any circumstances at this time",

the judge declared all three of appellants' children to be in need of assistance—that is deprived of, *and* unable to receive from unwilling or unable parents, ordinary and proper care and attention. This was partially predicated upon the possibility that Jertrude had been abused.

"A child of course, who may present some difficulty, who is perhaps unruly, difficult to deal with, often times,

unfortunately is the child that suffers the abuse. In this case it's the older child and *perhaps* is the . . . has been the subject of some abuse. *Perhaps* caused by stresses within this family that we don't then really know about. Because those stresses occurred in . . . in Africa or coming to this country, of course, I could only *speculate.* But the Court can . . . must find that this is a child in need of assistance. That the parents have not provided this child with proper care and attention and at this point the court can only conclude that they are unable to do so. And for this reason will make the finding that the . . . child is a child in need of assistance. In the context that I've indicated that the child, Jertrude, in my opinion has been . . . has not been properly cared for and has been a .. . . in my view, *perhaps,* the subject of abuse. Some of the injuries at least . . . can only in my . . . in my view have occurred in this fashion." (Emphasis added).

At the disposition hearing the judge's reluctance to find abuse rather than speculate upon its likelihood was again manifest when he observed the manner in which the mother handled one of her younger children which the judge left with her.

"I guess to put it bluntly, seems like she treats it like a rag doll. I'm not saying I've seen any deliberate mistreatment of the child. But picking the child up under the arms, lifting it up in the air . . . I mean the point occurs to me, to dislocate the child . . . it's not a Raggedy Ann doll, it's a child. Dislocate arm or the shoulder. Maybe rough handling is . . . is what I'm observing. And I'm just wondering if that's . . . goes on . . . obviously it goes on right here in Court. I mean it's unintentional I'm sure. But nonetheless that's . . . traditionally she handles the child. It occurs to me that this could be explained some of the . . . injuries to Jertrude. Or I mean if Jertrude is been particularly obnoxious around her parents, at a given time, which all children get, maybe that carries over into some rougher handling in disciplining. As opposed to just a willful beating of the child, such as rough handling is

what I'm talking about. And I just wonder if you observed that. We've all seen that in the courtroom, I'm sure."

This was responded to by the field representative who had become more and more knowledgeable of the cultural mannerisms of the Central Africans as well as more intimately understanding of the parents involved.

"I've observed it. I've also been to the embassy and I noticed it's more or less characteristic of ... the ... people and I think it's more of an affectionate ... you do it when you're feeling affection rather than when you're angry. You sort of ... it's like a jerking motion. And I think it could hurt a child. Particularly someone as small as Jertrude. And I've talked to [the mother] about it. I don't think it's done in anger. I've never ...

COURT: I wasn't saying it was done in anger. I don't know that it was done in affection. It was just a matter picking the child up and ... getting it moved out of the room or something ... somewhere else in the room and I think ...

MS. GILMOND: [2] I think that could account for ... an injury. I don't ... you know, I don't think ... I can't remember if Jertrude has been ever ...

COURT: Is any of this program geared to try to ... retrain [the mother] or something?

MS. GILMOND: Well, when I called Arlington Mental Health I said that the preface would have to be around ... cultural adaptation and ... parental discipline. That sort of thing. I asked them, you know, if I spoke [to the mother] she would, you know, if she thought it would hurt the child, and would stop right away. One day I ... you know, I did explain to her that in this country we ... don't leave little children unattended. She didn't know that that was not done. I think there was like a seven year old who was staying with a two year old. And I told

---

2. Ms. Gaumond was referred to as Ms. Gilmond in appellants' brief and transcript.

her that in this country, we don't do that. And that was ... you know, one other area where she didn't know that you don't do that. Even for a ... then some parents do it but ... there's a risk."

The judge then incorporated his formerly exhibited fear of the likelihood of abuse existing with his observation of the absence of gentle handling and decided to continue all of the children under judicial jurisdiction and Jertrude in shelter care.

"All right. The Court did conclude at the last hearing and I know the [parents] didn't like to hear it, but I have to conclude from the last hearing that there was in my way of thinking, a number of injuries to this child, that not only weren't explained, but have to be caused by some mistreatment. Certainly by mishandling and possibly by some abusive behavior on one or both parents. And I ... as I say I have to observe what I've mentioned to Miss Gilmond, which may, to my own mind, be an explanation in part. As to what some of the unexplained injuries have been. But I do feel that the children ... the child rather ... all children need to be continued under the jurisdiction of the Court. All need to be continued in commitment to the department. And feel that Jertrude needs to be continued in the ... out of the home, in the manner that she has been for since the initial hearing."

We have carefully read and reread every word of the entire record, including the evaluation reports of the diagnostic teams, the hospital reports, and the testimony of all witnesses. We have reviewed the photographs and have taken every precaution to understand the medical terms and cultural reflections not indigenous to our land or our profession. We are as deeply concerned and troubled as were the judge and members of the diagnostic team.

### the adjudication

We found sufficient evidence throughout the record to indicate that this family was in need of assistance and that the children were not receiving ordinary and proper care and attention. The record is replete with comparisons of the life

styles—nomadic existence, crowded living conditions, customs, mores supervisory practices of the children—of this Central African family with the standards expected in America. In conducting our review, we are well aware that:

"At such a proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. See *Smith v. Organization of Foster Families*, 431 US [816], at 835, n. 36, 53 LEd2d 14, 97 SCt 2094 [at 2105]. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent. Because parents subject to termination proceedings are often poor, uneducated or members of minority groups, id., at 833–835, 53 LEd2d 14, 97 SCt 2094 [at 2103–2105], such proceedings are often vulnerable to judgments based on cultural or class bias.

The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination." *Santosky v. Kramer*, 455 U.S. 745, 762–763, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982) (footnote omitted).

■ It appears that the County and the court were equally aware. The reports and testimony frequently excused the contrasting practices by suggesting that while they were apparently not in accord with our standards of child rearing, the practices or lifestyles were acceptable in Central Africa. Infants, for example, were left with other infants of little more maturity but without semblance of adult supervision. Crowded living conditions of numerous families in minimal space were explained as being acceptable in Central Africa. The practices that caused the injuries to Jertrude, even as explained by the parents—such as lack of supervision resulting in falls causing bruising and fractures,[3] as well as the "cupping" procedures leaving oval scars—are simply not acceptable treatment or care of children in America. Even if the scabies explained some of the scars, it was never the subject of medical attention so far as the record reveals.

The judge concluded that

" . . . we really have basically a family that was in need of assistance. And needs the . . . supervision and assistance not from the court directly but from the Court service agencies."

To the extent that such conclusion was founded upon that which is "ordinary and proper care and treatment" in this country, we find no fault. The judge was not clearly in error by having imposed upon these people the standard of care that is expected of them so long as they elect to live

---

**3.** The judge indicated similar concern when observed:

"As the County Attorney has said, if the indeed the parents explanation is credible, that the injuries were received from falls, then this child is falling an awful . . . a great number of times. And as . . . apparently is lacking in the, what we would expect to be protection by the parents."

Observations such as that contained in the evaluation update that

"Jertrude has problems in the foster home relating to her peers and older children. She lacks social skills and is constantly fighting, biting, or tattling. She appears to be a moody child and anger is a dominant mood,"

proliferate the record extract and, incidentally strongly support the explanation of the parents regarding some of the child's initial injuries.

with us. In doing so, he was eminently correct and the Department sensitively carried out supervision and assistance which the family appears cooperatively to have accepted. Md.Cts. & Jud.Proc.Code Ann. § 3–820(b)(3).[4]

█ As pointed out by appellants one of the difficulties in this case arose from the seeming preoccupation of the court with Jertrude's condition and apparent lack of similar concern for her two younger sisters. We have pointed out that the judge, by his remarks, obviously was concerned with the family unit as a whole, as well as with Jertrude's more apparent problems. Appellants are simply in error when they state that "no evidence was adduced that Raissa and Letycia had been neglected or abused." While the evidence was not individually designated as to either child, the entire record dealt with the family practices of child raising, a procedure foreign to our own.

### the disposition

It is that understandable preoccupation with Jertrude wherein we find considerable concern. Her problems and condition certainly were reflective of some of the family practices in child raising, especially if one accepts the parents' explanation of Jertrude's condition. Their explanations indicated not only that the Central African practices they followed did not provide ordinary and proper care and attention by our standards, but reenforced as well that their lack of knowledge of our ways rendered them unable to so provide the children.

The standard for finding a need for assistance, however, is quite different than the standard for removing a child from

---

**4.** That section renumbered effective January 1, 1983 at § 3–820(c)(3) reads as follows:

"(c) In making a disposition on a petition, the court may:

. . . . .

(3) Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family."

a home. Upon finding the need for assistance, the judge in conformity with § 3–820 (now) (c)(3), ordered

" . . . the child[ren] [and] parents, to participate in rehabilitative services that are in the best interest of the children."

And the record indicates that this educational procedure has been and is effectively being administered.

■ The standard for removing a child from its home is far more stringent. Its rigidity is implicit in one of the express purposes of the Juvenile Causes law, § 3–802(a)(3).

"(a) The purposes of this subtitle are:

.     .     .     .     .

(3) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety."

This emphasis upon the retention of the family unit is underscored by the Supreme Court in *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972):

" 'The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska,* 262 U.S. 390 [43 S.Ct. 625, 626, 67 L.Ed. 1042 (1983), "basic civil rights of man," *Skinner v. Oklahoma,* 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and "[r]ights far more precious . . . than property rights," *May v. Anderson,* 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944).' "

■ There is a serious question whether the evidence in this case warrants so drastic a disposition as to have removed Jertrude from her home. There was not the slightest evidence that the parents, or either of them, had abused the child. See *Fabritz v. Traurig,* 583 F.2d 697 (4th Cir.1978).

The removal had originally been predicated upon the equivocally expressed, speculative possibility of abuse by a parent:

> "In the context that I've indicated that the child, Jertrude, in my opinion has been ... has not been properly cared for and has been a ... in my view, perhaps, the subject of abuse."

At disposition, the shelter care was continued upon the same speculative possibility, reenforced only by a res ipsa conjecture.

> "I have to conclude from the last hearing that there was in my way of thinking, a number of injuries to this child, that not only weren't explained, but have to be caused by some mistreatment. Certainly by mishandling and possibly by some abusive behavior on one or both parents."

■ In light of the fact that the judge had commented upon a "mishandling" of one of the younger children in his very presence yet left both of the younger girls with their parents, we would be hard-pressed to comprehend the contradiction of having removed Jertrude for her protection, but not the others, unless it was based upon his subjective concern that she had been abused and may be abused further. Yet the facts upon which this fear was predicated are minimal at best and but for his express res ipsa conjecture simply do not exist at all. If such reasoning were appropriate, it nevertheless could have led to either of two conclusions: that Jertrude had been overtly abused or that she had been neglected. The former would have warranted her removal for her safety. Only under extreme circumstances would the latter, which circumstances are disabused by the decision of the judge to leave the two younger girls with their parents.

■ The Legislature and the Supreme Court have both expressed the view that children should not be uprooted from their family but for the most urgent reasons. We add to that admonition the further suggestion that the reasons should be clearly explicated by the trial judge who assumes that awesome responsibility and that his findings of fact should expressly support his conclusions.

■ If the judge in this case had factually concluded that there *were*—not might have been—overt abuse he should expressly articulate the facts, circumstances and/or inferences upon which he relies. If, however, he has factually concluded what we may call "constructive abuse" of parental misjudgment (as appears implicit in *State v. Fabritz*, 276 Md. 416, 348 A.2d 275 (1975), but rejected by the Fourth Circuit Court of Appeals in *Fabritz v. Traurig, supra* ), that too should be explicated. § 3–801(e)(2). The fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution.

■ We will vacate so much of the disposition as continued the removal of Jertrude from her parents and remand the case for a prompt rehearing in accordance with the judge's promise that

"if all parties want a rehearing within thirty days we'll set . one."

The record seems to indicate that all parties had requested such hearing, giving rise to the suggestion, but we were informed at argument that upon petition pending this appeal, it was denied. Upon remand the judge may hear further evidence if he deems it necessary, but upon deciding Jertrude's custody shall either clearly and unequivocally articulate his factual findings, conclusions and reasons, or he shall see to the expeditious (but not necessarily abrupt) return of Jertrude to her parents, permitting the Department representatives who had exhibited sensitivity and concern to effect and assist through a supervised reunion, carefully concerned with the child's view of this strange occurrence in a strange land overrun with strange speaking and strange appearing people.

■ The unspoken and evidentiarily unsupported fears for Jertrude's physical well-being from intentional abuse can be abated by careful monitoring and by continued supervision. What we have called the constructive abuse of parental misjudgment, see *State v. Fabritz, supra,* can be averted

by continuing the type of educational assistance which from the testimony appears to have been offered and received.

Although we have been critical in the past of some of appellee's judgments, see, *e.g., Montgomery County v. Sanders,* 38 Md.App. 406, 381 A.2d 1154 (1977), we were impressed by the effort and concern exhibited in this case. We were also impressed in a nation self-chastized as uncaring that a mammoth agency in an enormous country utilized the cost, effort and expertise exhibited here out of concern for a single little girl from an obscure African nation about which very little was known. The error in this case, of reaching into a home and removing a child from its parents, is a serious one. See *Stanley v. Illinois, supra.* In this instance, despite the dearth of evidence of intentional abuse, the error was made on the side of prudence. But given the judge's own expressed doubts, the record simply does not support the disposition of removal which the law views as the least desirable of his options.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO COMPLY WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.