533 A.2d 16

**In re WILLIAM B.**

**No. 267, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Nov. 10, 1987.
Certiorari Denied Feb. 24, 1988.

Michael A. Genz, Hughesville, for William B.

Victoria S. Keating, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellants, Peggy B. and Julius M.

Sarah R. Kaplan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee, Charles County Dept. of Social Services.

Argued before BISHOP, ALPERT and KARWACKI, JJ.

ALPERT, Judge.

The plight of William B. and his family is a tragic and frustrating one. One thing is certain: there are no "win-

ners" in this case, regardless of how the appeal is resolved. On December 8, 1986, two protective service workers from the Charles County Department of Social Services removed William and Brandon B. from the home of their natural parents on the ground that their mother, Ms. Peggy B., was unable to care for them. The Department of Social Services (DSS) requested that a child in need of assistance (CINA) petition be filed on the children's behalf. After an emergency shelter care hearing on December 9, 1986, Judge Richard Clark of the Circuit Court for Charles County ordered that temporary care and custody of the children be given to the DSS until a final hearing and disposition could be made.

The hearing was held on January 7, 1987, and at its conclusion, Judge Clark determined that William and Brandon were children in need of assistance under § 3–801(e) of Cts. & Jud. Proc. Art. (1984 Repl. Vol., 1987 Cum.Supp.). On February 18, 1987, after receiving a report from the DSS, Judge Clark ordered that the children remain in the care and custody of the DSS until their parents (or either parent) attended an alcohol detoxification in-patient program and followed through with an out-patient program. The children's natural parents, Ms. Peggy B. and Mr. Julius M., and the attorney for the children appealed the decision as to William but not as to Brandon B. We shall affirm.

It appears from the record that Peggy B. and Julius M. live together with Mr. M.'s mother and sister. It also appears, however, that Peggy B. was the primary caretaker of the children.

After the two-day hearing, Judge Clark concluded that the children were not receiving ordinary and proper care because of both parents' addiction to alcohol. He went on to state:

> [W]hen people have alcohol abuse problems, severely, they lose interest in everything, their own cleanliness and their own health and own care, they lose interest in their seeing to it that their families are provided with those basic needs of love and that is the situation we have here.

We have people who are totally addicted to alcohol but alcohol is the No. 1 priority in their life and their children, in spite of the fact they profess and probably do in their hearts love their children, they put them second.

There was ample evidence presented that both natural parents had drinking problems. There was testimony by several witnesses as to the consumption of alcohol by Ms. B. The judge also received a copy of a report prepared by the Charles County Health Department prior to disposition. The report, through a Michigan Alcoholism Screening Test, administered on January 14, 1987, diagnosed Ms. B. as an alcoholic. A score of 5 or more points indicated a drinking problem; most alcoholics, however, score 10 points or more. Ms. B. scored 31 points. The report also indicated that Ms. B. showed evidence of psychological and physical dependence on alcohol. Ms. B. told the tester she hadn't taken a drink in 36 hours and the report indicated she was going through withdrawal. Although Ms. B. admitted having black-outs, she minimized her alcohol problem.

Julius M. scored a nine on a Michigan Alcoholism Screening Test administered to him on January 14, 1987. The report indicated Mr. M. had been taking medication for seizures for the last several years and that it was dangerous for him to consume any alcohol. Mr. M. informed the counselor that he had not had a drink since November and that prior to that occasion, he had not had a drink in eight months. The counselor found Mr. M. did not display any physical evidence of alcohol abuse. Additionally, the record showed that at the time of the December 8, 1986 emergency shelter hearing Mr. M. was incarcerated for a Driving While Intoxicated conviction. The date of the offense was not indicated.

Three prior reports of neglect had been made to the DSS, and it appears each one was related to the parents' alcohol problem. In March of 1986, after an evaluation showed she had a drinking problem, the DSS persuaded Ms. B. to go through a detoxification program at the Jude House. The DSS furnished a parent aide to provide transportation and

support during Ms. B.'s attempt to correct her problem. When Ms. B. reached the Jude House as scheduled, the program refused to admit her because she had been drinking within the 72 hours prior to admittance. Someone from that program suggested that Ms. B. go to North Arundel's Detoxification Center. When she arrived at the center, a pint of wine was discovered in her bag. Ms. B. stayed at the center for approximately one week, and it appears she made some progress toward combatting her alcohol problem. She subsequently completed a 28-day program at the Jude House and attended Alcoholics' Anonymous meetings at least two or three times a week until June 25. When the parent aide from DSS came to transport Ms. B. to the AA meeting on June 25, however, Ms. B. was intoxicated and refused to go. After that date, the aide said Ms. B. had been drinking on most of the occasions that the aide saw her. Finally, on December 3, 1986, when the aide went to the house to transport Ms. B. to a doctor's appointment, Ms. B. was intoxicated and abusive. Ms. B. and Mr. M., although present throughout the proceedings, presented no evidence.

■ Judge Clark found that this ongoing problem with alcohol made the parents either unable or unwilling to take adequate care of the children. Section 3–801(e) of the Courts and Judicial Proceedings Article provides that a child may be judicially determined to be in need of assistance if

(1) He ... is not receiving ordinary and proper care and attention, and

(2) His parents ... are unable or unwilling to give proper care and attention to the child and his problems.

Md.Cts. & Jud. Proc. § 3–801(e) (1984 Repl. Vol., 1987 Cum.Supp.). Appellants have not appealed the finding that William is a child in need of assistance. Rather, Ms. B. and Mr. M. contend that the facts and circumstances presented at the hearing do not warrant the "drastic remedy" of separating William from his parents. Although we agree that this is not a step to be taken lightly, we hold the trial

judge did not err when he removed William from the care and custody of his parents.

The Code provides that a child may be separated from his parents *"only when necessary* for his welfare or in the interest of public safety." Cts. & Jud. Proc. § 3–802(a)(3) (emphasis added). We have explained "necessity" by stating "only under the most extraordinary circumstances [may] a parent . . . be divested of [the] right and custody of a child." *In re McNeil,* 21 Md.App. 484, 497, 320 A.2d 57 (1974). *See also In re Beverly B.,* 72 Md.App. 433, 530 A.2d 766 (1987) ("removal of a child from her mother is a drastic remedy which should be avoided"); *In re Christiana G.,* 72 Md.App. 443, 530 A.2d 771 (1987) (a child should be removed from his home only " 'for the most urgent reasons' " (citing *In re Jertrude O.,* 56 Md.App. 83, 99, 466 A.2d 885 (1983)).

## ALCOHOLISM AS A GROUND FOR REMOVING A CHILD FROM CUSTODY OF HIS PARENTS

■ Mere alcoholism of the parents is not grounds under the statute for removing a child from his home with his parents. The law permits involuntary separation of a child from his parents only if the parents are unable or unwilling to give the child ordinary care and attention, and even then only if the court finds that the drastic remedy of removing the child is necessary for his welfare. *See* Cts. & Jud. Proc., § 3–801(e) and § 3–802(a)(3). Other jurisdictions agree. *See Matter of S.D., Jr.,* 549 P.2d 1190 (Alaska 1976) (alcoholism); *In Interest of Robbins,* 230 N.W.2d 489 (Iowa 1975) (drug addiction); *In re Phifer,* 67 N.C.App. 16, 312 S.E.2d 684 (1984) (alcoholism).

■ The judge, however, may find that the parents' alcohol dependency causes them to fail to give the child ordinary care and attention. Although the parents' battle with the disease of alcoholism entitles them to compassion, it does not absolve them from their duties to their children under the statute. As explained by the Supreme Court of Alaska:

> The petitions with which we are concerned are not based on the disease of alcoholism, as such, but on observations of extensive intoxication.... Even, however, if the intoxication under these circumstances is to be considered a disease, it does not mean that it cannot be regarded as a fault.... For example, insanity is a form of mental illness. While no moral opprobrium should be attached to such a condition, insanity or other severe mental illness could still constitute a fault or defect in the context of child care. Although an isolated incident of intoxication of short duration might not be considered sufficient to constitute a fault for the purposes of a dependency finding, we hold that intoxication over an extended period of time does constitute a "fault"....

*Matter of S.D., Jr.*, 549 P.2d at 1197. *Cf., In Re Beverly B.*, 72 Md.App. 433, 530 A.2d 766 (Appellant's contention that her daughter was removed from her home because of her mental illness was incorrect. The daughter was removed because of the adverse impact appellant's mental illness had on her child's development.).

The Alaska court then went on to explain:

> As we have previously indicated, the fault must be related to the "lack of parental care" of the child. Thus, we must determine whether the use of alcohol resulted in a lack of proper care for M.D., A.D. and I.D. Looking to the term "lacks proper parental care", it is apparent that it may be manifested in many ways. Failure to properly clothe, feed, maintain cleanliness, supervise and guide children under varying circumstances could justify such a finding.

*Id.*

We will reverse the findings of fact of the trial judge only if those findings are clearly erroneous. Md. Rule 1086; *In Re Beverly B.*, 72 Md.App. at 440, 530 A.2d 766.[1] More-

---

1. Appellant argues that there were three clearly erroneous findings of fact: (1) that the parents are drunk more than they are sober; (2) that they "run the road" and go to bars; and (3) that Ms. B.'s desire for

over, we will reverse the ultimate conclusion based upon those findings only if there has been a clear abuse of discretion. *Id.*

Much of the evidence at the hearing concerned the younger child, Brandon B. Brandon was nearly five years old at the time of the hearing and was severely handicapped. He suffered from fetal alcoholism, mental retardation, cerebral palsy and visual problems. Brandon had the motor skills of a 3 to 4 month old infant, and could roll over only with great difficulty. He was able to understand language as would an 11–12 month old infant, and could express himself as would a 5–6 month old infant.

Brandon attended the F.B. Gwynn Special Education Center for the school years 1985–86 and 1986–87. There was testimony from the school's bus driver that Ms. B. had been drinking frequently when she came to meet Brandon and carry him home. The bus driver also stated that Ms. B. was not as careful handling Brandon when she had been drinking (Brandon's head and neck had to be supported as would an infant's), and that several times Ms. B. had difficulty carrying Brandon. The driver also indicated that two or three times during the 1985–86 school year Ms. B. was not at the bus stop at the regular time, and the driver had to take Brandon home with her.

Brandon's special education teacher also testified. She complained of problems with Brandon's hygiene. He had to be bathed at school once a week or more because of an unpleasant odor, most often after a weekend or a holiday. She also said that Brandon's diaper was unusually wet when he reached school and needed to be changed immedi-

---

alcohol takes precedence over everything in her life. We think the evidence adduced at trial shows that the judge was not clearly erroneous as to his conclusions concerning points one and three. Insofar as point two is concerned, appellant is correct in that there was no evidence that the children were left home while the parents frequented bars. Judge Clark's comments, however, indicate that he was not concerned about the parents "running the road." Rather, he was concerned about the frequency and effect of the parents' alcohol consumption.

ately. On one occasion, he had such severe diaper rash that "his skin was peeling off his body," and he cried when he urinated. There was also testimony that roaches crawled from Brandon's shoes and diapers on several occasions. She testified further that Brandon periodically had what appeared to be insect bites on his body, but she was not able to discover what caused them. There was testimony from the DSS parent aide that Ms. B. herself was disheveled and unclean when she had been drinking for prolonged periods of time, and had to be reminded to bathe and wash her hair.

There was also testimony that Brandon came to school one day with a large knot on his head the "size of a golf ball and raised about ¼ inch," although he was completely unambulatory. When the bus driver asked Ms. B. about the injury, she disclaimed knowledge and said it did not happen at home. Brandon's teacher also testified that Brandon was sent to school one day with a 102–degree temperature. The school nurse called a neighbor of Ms. B. (because Ms. B. had no phone) and asked the neighbor to relay a message that Brandon was ill and should be picked up. The nurse waited on the line for a period of time until the neighbor returned and said Ms. B. would come in to get Brandon. Ms. B. never arrived at the school, however, and Brandon had to be sent home on the bus. Brandon was not taken to see a doctor for his illness until a teacher called the DSS. The child protective service worker who went to Ms. B.'s home to take Brandon to the doctor said that upon her arrival Brandon "could hardly breathe."

There also was testimony as to the condition of the family home. The home was without a telephone or indoor plumbing. Brandon's teacher and the parent aide from the DSS testified that the home was not clean. On one visit, Brandon's teacher observed 15–20 roaches crawling over fish Ms. B. was cleaning on the kitchen table. Although it was clear the family had financial problems, that does not excuse the lack of sanitary living conditions. As noted by Judge Clark: "You don't have to be rich to be clean. You

don't have to be wealthy to see that your house isn't overrun by cockroaches...."

## EVIDENCE OF NEGLECT OF SIBLING

■ Appellants, however, contend that the evidence as to Brandon's care is not relevant to a determination of whether William was neglected. We disagree. The parents' ability to care for the needs of one child is probative of their ability to care for other children in the family. *Accord People in Interest of D.L.R.*, 638 P.2d 39, 42 (Colo.1981) ("[T]he trial court may properly consider the treatment accorded other children in determining whether the child before it is neglected and dependent."); *In re K.D.E.*, 87 S.D. 501, 210 N.W.2d 907, 910 (1973) ("Where the trial court has determined that neglect or abuse exists in regard to one child, it is within its discretion to determine the likelihood of abuse of other children in the same family."). *But see In re J.M.*, 131 Vt. 604, 313 A.2d 30, 33 (1973) (Parents did not appeal finding of neglect as to four of their five children. The court held that the findings applicable to the other four children did not control the case of the youngest child.).

■ Appellants point out, however, that Brandon's handicaps gave him special needs that are not possessed by William and that their care for Brandon cannot be relevant. We hold that the differences between the children do not negate the reasonableness of an inference that the parents' inability to care for Brandon is evidence of an inability to care for William. The unmet needs of Brandon were not extraordinary ones requiring any particular sophistication, as would be the case if it were alleged the parents failed to fit Brandon's leg braces properly. Rather, the deficiencies in care that were pointed out at the hearing are basic and fundamental ones.

The judge need not wait until the child suffers some injury before determining that he is neglected. This would be contrary to the purpose of the CINA statute. The purpose of the act is to protect children—not to wait for

their injury. We are cognizant of the standard enunciated in *In re Jertrude O.*, 56 Md.App. 83, 466 A.2d 885 (1983):

> The fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution.

*Id.* at 100, 466 A.2d 885.

*Jertrude*, however, does not require a judge to wait for harm to occur before the child is characterized as neglected. It speaks to *"the fear of harm,"* which obviously is a fear of harm in the future. As noted by the Supreme Court of Colorado:

> The parents contend that speculative evidence regarding possible future harm will not satisfy the statutory burden in establishing dependency or neglect.... We ... note that a neglect or dependency proceeding is preventative as well as remedial. Under the circumstances of this case, requiring that a child be placed with parents in order to determine whether proper care and control will be provided or that harm would be done to the child, might prove detrimental to the child. Such a course would be in clear contravention of the plain purpose and meaning of the statutes relating to neglect and dependency.

*People in Interest of D.L.R.*, 638 P.2d at 42.

Similarly, the Appellate Court of Illinois stated:

> The respondent's argument that a minor must be found to be actually neglected and not merely subject to neglect in the future does not reflect the law. We are cognizant of the rule that a court may not speculate as to the future of a child.... This rule, however, is tempered and qualified by the law....
>
> > "It is true that a court may not speculate as to the future care of a child. However, it is also well-established that the primary consideration in a child-neglect case is the best interests and welfare of the child. (Citation.) When faced with evidence of prior abuse by

parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury."

*In Interest of Calkins,* 96 Ill.App.3d 74, 51 Ill.Dec. 447, 450, 420 N.E.2d 861, 864 (1981) (citations omitted).

We hold that there was sufficient evidence presented at the hearing to warrant the very real fear that some great harm might befall William if he remained in the custody of his natural parents. Although William is older than Brandon, at seven or eight years of age, William is incapable of caring for himself if he becomes ill, and of providing the "ordinary and proper care and attention" which parents normally provide as required by law.

Moreover, during her evaluation by the Charles County Health Department, Ms. B. admitted having blackouts, although she minimized their importance.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.