617 A.2d 1086

**IN RE: JOSEPH G.**

**No. 205, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 5, 1993.

Elliot N. Lewis, Baltimore, for appellant.

Cathy A. Dryden, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee DSS.

Argued before WILNER, C.J., and ROSALYN B. BELL and CATHELL, JJ.

ROSALYN B. BELL, Judge.

This is an appeal from a *de novo* hearing in the Circuit Court for Baltimore City, Juvenile Division, on exceptions from proceedings before a juvenile master. The circuit court found Joseph G. to be a child in need of assistance (CINA), and committed the child to the Baltimore City Department of Social Services (BCDSS). Mr. G., the father of Joseph G., appeals from the circuit court finding that Joseph G. is a CINA and the commitment of the child to BCDSS. Mr. G. contends on appeal that the circuit court erred because

—there was insufficient evidence to adjudicate Joseph G. a CINA; and

—there was insufficient evidence to support the disposition denying Mr. G. custody of Joseph G.

We affirm as to the adjudication of CINA and reverse as to the disposition.

## THE FACTS

Joseph G. was born on December 17, 1990 at 6:00 p.m. The evidence indicates that the delivery was uncomplicated. The child was examined by hospital personnel immediately postpartum and no abnormalities were noted. Joseph G. was again examined at midnight, and the examination was normal. At approximately 12:15 a.m. on December 18, 1990, the child was taken for a visit with his mother in her hospital room. The visit lasted 45 minutes. A few minutes after being returned to the nursery, a nurse, who was changing the child's diaper, noticed that the child's testicles were black, swollen and torn. The child was further examined by physicians, and a diagnosis of "blunt trauma" was made. The child was immediately removed from the mother's custody.

On January 22, 1991, BCDSS began CINA proceedings because of the apparent abuse of Joseph G. by his mother. The mother denied abusing Joseph G. Mr. G. testified that

he did not believe that the mother inflicted the injuries on the child, but that the injuries were caused by childbirth.

The mother had a history of substance abuse. Two of the mother's other children, Robert and Bradley,[1] were taken from her due to neglect, physical and sexual abuse. There was testimony indicating that Mr. G. was present during one instance where the mother sexually abused her son Bradley, and that Mr. G. did nothing to stop the abuse. There was also evidence, however, that Bradley was not telling the truth, and Mr. G. denied ever having been present during any such abuse.

Mr. G. lived with the mother until after Joseph G. was born, but they were never married. After the birth of Joseph G., Mr. G. moved to a house which was within walking distance of the mother's residence. After the CINA proceedings began, Mr. G. sought custody of Joseph G., but the court was concerned that the mother might have access to the child. As a result, Mr. G. moved several miles away from the child's mother to live with his own mother. Mr. G. testified that he had "broken up" with Joseph G.'s mother in July of 1991, but there was evidence that he was still involved with the mother. A licensed social worker (LSW) testified that she saw the pair holding hands and saw the mother put her arm around Mr. G. during a visit with Joseph G. The LSW also testified that she had a conversation with the mother after the supposed break-up in which the mother referred to Mr. G. as her "boyfriend."

## SUFFICIENCY OF THE EVIDENCE IN THE ADJUDICATION OF CINA

■ Appellant contends that there was insufficient evidence to find that Joseph G. was a CINA. We do not agree.

■ This Court may not set aside an adjudication of CINA unless the trial judge was clearly erroneous. *In re Beverly B.,* 72 Md.App. 433, 440, 530 A.2d 766 (1987); *see*

---

1. Mr. G. is not the father of Robert or Bradley.

*also In re Appeal No. 504,* 24 Md.App. 715, 723, 332 A.2d 698 (1975). In determining whether the trial court was clearly erroneous, this Court must "give due regard to [the trial judge's] opportunity to judge the credibility of the witnesses." *In re Appeal No. 504,* at 723, 332 A.2d 698. In addition, an appellate court cannot "disturb the ultimate conclusion based upon those factual findings if there has been no clear abuse of discretion." *In re Beverly B.,* 72 Md.App. at 440, 530 A.2d 766.

■ Maryland Cts. & Jud.Proc.Code Ann. § 3–801(e) (1974, 1989 Repl.Vol., 1992 Cum.Supp.), provides that a " '[c]hild in need of assistance' is a child who requires the assistance of the court because:

"(1) He is ... not receiving ordinary and proper care and attention, and

"(2) His *parents, guardian, or custodian* are unable or unwilling to give proper care and attention to the child...." (Emphasis added.)

The adjudication of a CINA is to be made by a preponderance of the evidence. *In re Beverly B.,* 72 Md.App. at 440, 530 A.2d 766.

The trial judge in the present case was not clearly erroneous in adjudicating Joseph G. a CINA. There was testimony from the nurses who were present at the birth of Joseph G. that his injuries did not occur at birth. One nurse testified that the birth was uncomplicated, that the baby was not in a breech position, and that no forceps were used. The nurse also stated that, in the hundreds of deliveries she had attended, she had never seen injuries of the type exhibited by Joseph G.

At the *de novo* hearing, BCDSS entered photographs of Joseph G.'s injuries, which were consistent with the medical diagnosis of "blunt trauma" as the cause of the injuries. We cannot say the trial judge was clearly erroneous in finding, by a preponderance of the evidence, that Joseph G. was physically, if not sexually, abused, and therefore was not receiving "proper care and attention." The trial judge

also found that the mother was unwilling or unable to care properly for Joseph G., and adjudicated him a CINA.

Appellant next argues that, even if there was sufficient evidence to find that Joseph G. was not cared for properly by the mother, there was insufficient evidence that he was unable to give the child proper care. Appellant also argues that there can be no finding of CINA unless both parents are unable to render proper care. We need not reach this contention because we hold that there was sufficient evidence that appellant was unwilling or unable to care for Joseph G.

■ Appellant in his brief states that "[t]he only evidence that appellant is or was unable or unwilling to give proper care and attention to his son comes by way of the expert testimony" of two licensed social workers (LSWs). The LSWs testified that Bradley told them appellant was present when Bradley was sexually abused by his mother. Appellant claims these LSWs should not have been permitted to express their opinions that appellant was unable to care properly for his son based on the inadmissible hearsay statements of Bradley. We do not agree with appellant.

■ The admission of expert testimony is within the discretion of the trial court. *Scott v. Prince George's County Department of Social Services,* 76 Md.App. 357, 386, 545 A.2d 81, *cert. denied,* 314 Md. 193 (1988), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3226, 106 L.Ed.2d 575 (1989). Furthermore,

> "[a]n expert witness may testify to an opinion based on facts ordinarily inadmissible as hearsay, but which are facts of the type reasonably relied upon by experts in the field.... The information does not have to be admitted into evidence for the expert to use it in forming an opinion. If the facts on which the expert bases his or her opinion are inadmissible as substantive proof, they may still be used to provide the required factual basis for the opinion."

*Scott,* 76 Md.App. at 386–87, 545 A.2d 81. The trial court, after hearing evidence of the LSWs' bases of knowledge and contact with Bradley, did not err in admitting the expert testimony.

There was other evidence, contrary to appellant's assertions, to prove that appellant was unwilling or unable to care for his son. There was testimony that cast doubt upon appellant's claims that he had "broken up" with the mother. The trial court placed the most importance on appellant's own testimony that he did not believe the child's injuries were caused by the mother. This was a source of great concern to the trial judge:

"I am satisfied that based on [appellant's] testimony, that he is not a fit and proper person to have custody of this child because he cannot protect the child.

"He does not accept the fact that the child was physically or sexually abused, in spite of the overwhelming evidence to the contrary. He has obviously maintained some contact with the mother since the child was born. In fact, he states that they lived together until early this summer and I am not sure what that contact is.

"Furthermore, [appellant] has exhibited no substantial information, in my opinion, as to any other matters relating to his fitness and propriety as the custodial parent."

■ The trial judge was obviously not persuaded that appellant would be a fit parent by appellant's testimony that: he had a crib for the child at his current home; he contacted a day care center that had a space for the child; he assured the court that he would comply with a court order not to let the mother see the child. The trial court has discretion as to the credibility of witnesses. *In re Appeal No. 504,* 24 Md.App. at 723, 332 A.2d 698. The trial judge did not abuse his discretion in disbelieving appellant's testimony that he would be able to protect the child from its mother.

Appellant presented no other evidence of his fitness as a parent. There was no error in the trial judge's finding that

appellant was unwilling or unable to care properly for his son because appellant cannot protect the child from its mother. The adjudication of CINA was therefore proper.

## SUFFICIENCY OF THE EVIDENCE FOR THE DISPOSITION DENYING APPELLANT CUSTODY OF JOSEPH G.

Appellant next argues that, even if there is sufficient evidence that Joseph G. is a CINA, there was insufficient evidence to warrant denying appellant custody of his son. Appellant also argues that a more stringent standard of proof is required to deny parental custody than is needed to make an adjudication of CINA, and that standard was not met in the *de novo* hearing. We agree that a more stringent standard of proof is required to deny custody, and we hold that the more stringent standard was not met in the hearing.

This court has recognized that depriving a parent of custody of a child is a drastic measure that should only be taken when necessary for the welfare of the child. Md.Cts. & Jud.Proc.Code Ann. § 3–802(a)(3) (1974, 1989 Repl.Vol.); *see also In re Beverly B.*, 72 Md.App. at 440, 530 A.2d 766; *In re Jertrude O.*, 56 Md.App. 83, 98, 466 A.2d 885 (1983), *cert. denied*, 298 Md. 309, 469 A.2d 863 (1984).

This Court in *In re William B.*, 73 Md.App. 68, 73, 533 A.2d 16 (1987), *cert. denied*, 311 Md. 719, 537 A.2d 272 (1988), was faced with a similar issue, where the parents of William B. were alcoholics. William B. was adjudicated a CINA, and the child was removed from the custody of the parents. On appeal, the parents did not contest the adjudication of CINA, but contended that "the facts and circumstances presented at the hearing do not warrant the 'drastic remedy' of separating William from his parents." *In re William B.*, 73 Md.App. at 72, 533 A.2d 16. The Court stated:

"The law permits involuntary separation of a child from his parents only if the parents are unable or unwilling to

give the child ordinary care and attention, and even then only if the court finds that the drastic remedy of removing the child is necessary for his welfare."

*In re William B.,* 73 Md.App. at 73, 533 A.2d 16.

The Court in *In re Jertrude O.,* 56 Md.App. at 99, 466 A.2d 885, stated:

"The Legislature and the Supreme Court have both expressed the view that children should not be uprooted from their family but for the most urgent reasons."

In the instant case, the trial judge found that appellant was not a fit parent because appellant denied that Joseph G. suffered abuse at the hands of the child's mother, and because the judge was concerned that appellant could not or would not protect the child from his mother. We hold that the evidence in this case is not sufficient to justify the drastic measure of removing a child from the father.

"The fear of harm to the child or to society must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution."

*In re Jertrude O.,* 56 Md.App. at 100, 466 A.2d 885. There was no such hard evidence in this case. On the contrary, there was evidence that appellant moved across town to be far enough away from the mother to obtain custody of his child. Appellant has obtained employment, and has investigated child care facilities. Appellant had also apparently been making regular visits with Joseph G. Other less drastic remedies were available to the trial judge, such as awarding provisional custody of Joseph G. to appellant and imposing conditions on that custody, including but not limited to a prohibition against any visitation between the mother and child and supervision of the child's care and living arrangements.

We therefore vacate the portion of the disposition that divests appellant of custody. Ordinarily, in reversing such a decision, the result would be that the child is placed with the father with such assistance as BCDSS could appropri-

ately offer to make sure that the child was fully protected, and to make sure that the child was receiving proper care and attention. In the instant case, a substantial amount of time has passed since Joseph G. was taken away from his mother. We have no way of knowing whether appellant has resumed a close relationship with the child's mother, whether appellant has a place at his home for the child, whether he has in the interim followed a pattern of visitation with the child so that a meaningful relationship between the child and the father is in place. In short, in view of the almost two years that this child has been in foster care, with good or bad results, we do not know what is now in the child's best interests, bearing in mind as we must, the significance of blood relationships.

Having said this, we will vacate that part of the judgment that denied the father custody of Joseph G., and remand this case to the court to take a fresh look at the child and his father to make the difficult determination of what is best for this child.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.

WILNER, Chief Judge, dissenting.

The panel majority concludes that the evidence in this case supports the trial court's determination that appellant was unwilling or unable to give proper care and attention to his infant son, Joseph, and that, as a result, it is not necessary to determine whether a finding of CINA can be sustained where there is one parent who *is* willing and able to give such care and attention. I disagree with both conclusions.

I would hold, based on the definition of "child in need of assistance" in Md.Code Cts. & Jud.Proc. art., § 3–801(e) that, if proceeding under § 3–801(e)(2), the court cannot declare a child in need of assistance unless it finds that *both*

parents are unable or unwilling to give proper care and attention to the child and his problems. I think this is clear from the Legislature's use of the plural "parents" in that section, in contrast with its acquiescence in the singular, "guardian" and "custodian" in the same section, and I think is clear from the predominant public policy, expressed in several places throughout the Code, of keeping families intact whenever possible.

As the panel majority notes, "child in need of assistance" (CINA) is defined in Cts. & Jud.Proc. art., § 3–801(e) as a child "who requires the assistance of the court because ... (2) His parents, guardian or custodian are unable or unwilling to give proper care and attention to the child and his problems...." (Emphasis added.) This, it seems to me, is a clear recognition that, while a child may have but one guardian or one custodian, absent some further technological innovation of which I am not aware and do not choose to contemplate, he does have two parents.[1] For two reasons, I would hold that, if proceeding under § 3–801(e)(2), the court cannot declare a child to be a CINA unless it finds that *both* parents, if both are alive, are unable or unwilling to give proper care and attention to the child and his problems.

My first reason proceeds from a plain reading of the statute. Section 3–801(e)(2) clearly and unambiguously defines the status as existing only when the child's parents—both of them—have the deficiency noted. There is really no need to go behind that plain wording, especially when the alternative persons standing *in loco parentis*—guardian and custodian—are referred to in the singular.

More important than a technical, precise reading of the statute is that such a construction is required by the predominant public policy, expressed not only in the Juvenile Causes Act, but throughout other laws dealing with the family, of keeping families together whenever possible.

---

1. It is already possible for a child to have more than two parents, depending on how one defines "parent," but we need not get into that in this case. Joseph has one mother and one father.

Reference to a child's parents is made through the Juvenile Causes Act. Sometimes the term is used in the singular (see, e.g., §§ 3–810(e)(2) and (3), 3–810(f)(3), 3–810(l)(3), 3–810(m)(1), 3–814(c), 3–815(i), 3–820(d)(2)(i), 3–820(f), 3–822); sometimes it is used in the plural (see, e.g., §§ 3–802(a)(3), 3–811(c), 3–814(a)(4) and (b)(1), 3–815(b)(3), 3–820(c)(1)(iii), 3–837(c)). In one instance, the General Assembly used the term "any parent" (§ 3–818(b)); in another it referred to "either parent or both parents" (§ 3–830); and in a third it spoke of "each parent" (§ 3–837). In short, the Legislature clearly understood the distinction between the singular and the plural and made clear when it desired the law to apply to either parent alone and when it wanted the law to apply to both parents together.

Apart from that, when the Legislature spoke of parents in the plural, there was good reason for it to do so, and that is especially the case with respect to § 3–801(e). One of the articulated purposes of the Juvenile Causes Act is to "conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety." § 3–802(a)(3). This goal, of maintaining parent/child ties, extends beyond the Juvenile Causes Act (see Family Law art., §§ 4–401, 5–524, 5–525(c)(1), 5–544(1)(ii)), but it clearly is a "brooding omnipresence" over that Act. It strikes me as wholly inconsistent with that goal to declare a child in need of assistance, with all that portends, when there is a parent who is, indeed, willing and able to give proper care and attention to the child and his problems.[2]

The panel majority does not reach that issue because it concludes that there was sufficient evidence to support a

---

**2.** Requiring the State to show that both parents are unwilling or unable to attend to the child's needs is not an onerous burden. If a parent is absent, for example, and cannot be located, or has shown no interest in the child and no willingness to support him or provide companionship, the court could properly conclude that the parent—absent some clear evidence to the contrary—is unwilling or unable to take care of the child.

finding that appellant, Joseph's father, *was* in fact unwilling or unable to give proper care and attention to his son. That is the real point of my disagreement. I do not believe the evidence was sufficient to support such a finding.

The court brushed aside appellant's plea, not because of any unfitness on his part and not because of any expressed belief that, with the help of *his* mother, he could not provide a proper and loving home for Joseph, but only because of some fear that he might allow the child's mother to have unsupervised access to the child. This, in turn, was based on appellant's initial disbelief that the mother had abused the child and on some evidence of a continuing friendly relationship between the appellant and the mother.

Appellant explained his initial view. He said that he could not believe that any mother would deliberately crush her infant son's testicles, and so he attributed the injuries to trauma occurring during delivery. But for the experience gained in 15 years as a judge, of observing the awful things that people do to one another, I probably would not have believed it either. What young, normal father would so readily accept that the person he loved—the mother of his child—would do such a thing? To express doubt, to look for other reasons, strikes me as a normal reaction, even if it turns out to be an unwarranted one. It is true, of course, that *continuing* denial could lead appellant to allow unsupervised access and thus to potential harm to the child, but appellant made clear that the mother would *not* be granted such access. He had moved miles away from the mother and said that he was no longer romantically involved with her.

To rebut that, the State produced some evidence that a social worker once saw the pair holding hands and that a month after the break-up, the mother referred to appellant as her "boyfriend." Aside from the hearsay nature of the latter statement, if taken for its truth, the simple fact is that both appellant and the mother will continue to have a relationship as long as they remain Joseph's parents. They

both were accorded supervised visitation with Joseph and they occasionally exercised that privilege at the same time. They visited their child together. I see nothing wrong with that. Nor do I see anything sinister in the fact that, on one occasion, they were observed holding hands.

There was no clear evidence of any continuing romantic relationship between appellant and the mother. There was no clear evidence of any unwillingness or inability on appellant's part to care for Joseph. There was no clear evidence that appellant would allow the mother unsupervised access to the child.

A CINA finding carries important consequences. It is far easier for the Department of Social Services to obtain a full termination of parental rights following a CINA finding than otherwise would be the case. See Fam.Law art., § 5–313. Such a finding also may serve as a disincentive for appellant, guilty of no neglect or abuse on his part, to maintain frequent and meaningful contact with the child, especially when that contact must occur in a supervised, unnatural setting. The panel majority has concluded that the court erred in denying custody of Joseph to appellant but not in declaring appellant unwilling or unable to give proper care and attention to the child. On this record, I find that contradictory and unacceptable.