MEMORANDUM OF DECISION RE: NEGLECT AND UNCARED FOR PETITION
I. INTRODUCTION
This case arises out of a petition brought by the department of children and families (hereinafter referred to as the "petitioner" or "department") which was dated and filed on July 23, 1999, and which initially sought an adjudication that Corey-Thomas L., who was born on July 19, 1999, was a neglected child. A motion by petitioner to amend the petition to also seek an adjudication that said child was uncared for was granted on December 15, 1999. Petitioner is seeking a commitment of said child. CT Page 11418
II. HISTORY OF PROCEEDINGS:
On the date of filing of the petition an order of temporary custody was issued by the court, and was sustained on July 28, 1999 (Resha, J.). The court ordered competency and psychological evaluations of mother, Janet H., and ordered genetic testing to confirm the paternity of father, Christopher L.[2] A competency evaluation performed by Dr. Stephen Herman on August 19, 1999, concluded that mother was legally competent to participate in these proceedings. At the commencement of trial on January 28, 2000, father chose to remain silent relative to the allegations in the petition as amended as he was not the custodial parent at any time in the life of Corey-Thomas. See Practice Book § 33-1(b). In re DavidL., 54 Conn. App. 185, 188 (1999). Subsequent trial dates were February 2, 2000, February 14, 2000 and March 7, 2000, on which argument of counsel was heard and a briefing schedule was ordered. The last brief was filed on June 30, 2000.
It should be noted in the history of this case, and this court finds substantially relevant to the issues presented, that at the time of the birth of Corey-Thomas, a neglect and uncared for proceeding was pending in this court relative to mother's first child, Eric H., who was born on July 22, 1998, and whose father currently remains unknown.[3] An order of temporary custody was issued by the court (Walsh, J.) on July 28, 1998. On September 2, 1998, Eric H. was adjudicated an uncared for child due to his special needs and was committed to the care and custody of the petitioner. The commitment was extended by this court on September 1, 1999 and, again, on July 26, 2000; it is due to expire on September 2, 2001. On May 19, 2000, the department filed a petition seeking the termination of the parental rights of mother and whomever may be the father of Eric H. That petition is currently awaiting trial.
In the instant case the court finds that mother and father have appeared and have been provided court-appointed attorneys, as has Corey-Thomas. The court has jurisdiction in this matter and there is no pending action affecting Corey-Thomas' custody in any other court. As noted, father chose to remain silent, however, mother denies the allegations in the petition, as amended, and wants her son returned to her care and custody.
The neglect aspect of the petition, unaffected by the amendment, alleges that Corey-Thomas "is being denied proper care and attention, physically, educationally, emotionally or morally" and that said child "is being permitted to live under conditions, circumstances or associations injurious to well-being". General Statutes 46b-120, subparagraphs (8)(B) and (C) respectively. Emphasis added. The amendment CT Page 11419 which added the ground of uncared for to the petition alleges that said child "is homeless" and that "the child's home cannot provide the specialized care which the physical, emotional or mental condition of the child requires General Statutes 46b-120, subparagraph (9). Emphasis added. of crucial significance to the legal issue presented by this case is the fact that Corey-Thomas from the time of his birth to the present time was never in the care or custody of his mother; the child was taken from her before mother left the hospital where Corey-Thomas was born by virtue of a 96 hour hold invoked by the department on July 21, 1999 — two days after said child's birth.
During the trial the court heard from an evaluating psychiatrist, a psychiatric social worker, a mental health worker, a certified parent educator and two department caseworkers. The court, having read the petition, as amended, having reviewed the six (6) exhibits admitted into evidence, having taken judicial notice of Eric H.'s file, having considered the testimony of all witnesses and having reviewed the briefs submitted by counsel, does make the following findings.
III. FACTS:
The present circumstances in which mother finds herself, i.e., a termination of parental rights petition pending relative to her first child who has been adjudicated uncared for and a neglect and uncared for petition pending relative to her second child, are not entirely of her own creation. Unfortunately mother was the product of a tragic childhood precipitated by neglectful and abusive biological and foster parents. Mother's history is the antithesis of a DCF success story. Mother has been a mental health patient of Charlotte Hungerford Hospital since she was four years old; she has been in thirteen different foster homes, some of which compelled her to undergo emotional, physical and sexual abuse; at age sixteen she was hospitalized for alcohol abuse and at age eighteen left high school after completion of the eleventh grade. Her tragic history has ill-prepared her to assume the role of a parent. She was age twenty when she gave birth to Eric H. and was age twenty-one when Corey-Thomas was born.
Eric H. was removed from mother's care six days after his birth due to serious concerns voiced to the department by mother's mental health worker at Northwest Mental Health Authority and the hospital social worker. Among those concerns were mother's psychiatric condition evidenced by impulsive behavior, non-compliance with her medical and therapeutic regimine, and an overwhelming need to be the center of attention. She was residing with Christopher L. who was then sixteen years of age and with his father, both of whom were using and abusing her for sexual and monetary purposes. Mother was on probation for past CT Page 11420 threatening and stalking behavior. The three occupied a small apartment where Christopher L. and his father slept on the floor. The three were supported, at least, in part, by mother's monthly social security check. Mother's living circumstances and relationships in July 1998, clearly presented a great risk to the welfare of her newly-born child. She was oblivious to the consequences of her unsafe and dangerous actions.
A month after the issuance of the order of temporary custody relative to Eric H., that child was committed to the department and, pursuant to General Statutes § 46b-129 (j), steps were issued to mother, the purpose of which was to improve her ability to provide Eric with a safe and nurturing home and to facilitate Eric's return to her. Included in the court-ordered steps were parenting classes, individual counseling, compliance with the recommendations of Charlotte Hungerford's Behavioral Health Program and those of Northwest Mental Health, the maintenance of adequate housing and income and an order to comply with any recommendations to be made by Herman in a psychiatric evaluation ordered by the court. That evaluation was filed with the court on October 26, 1998, and included Herman's recommendations that mother remain in her women's group counseling even after her probation terminated, engage in individual therapy at least once a week, and attend psychiatric consultations to ensure compliance with any medication prescriptions. Herman diagnosed mother as having a Borderline Personality Disorder and opined that although the situation presented was one of high risk which demanded close scrutiny, mother should be "given the chance to demonstrate that she can indeed take appropriate care of her son and be a fit mother". State's Exhibit 1.
During the ten and one-half month period which transpired from the time the steps were ordered untit Corey-Thomas' birth, mother exhibited little compliance with those steps and with Herman's recommendations. Also, during that period mother continued to engage in a pattern of impulsive and dangerous behaviors similar to that which prompted department caseworkers to file the neglect/uncared for petition and to seek the order of temporary custody and commitment relative to Eric H.
In April 1999, six months after Eric's commitment, mother enrolled in and completed a six week parenting course at Brooker Memorial. Suzzane Weber, the instructor, however, testified that she saw no substantial change in mother's parenting ability and expressed concern that mother lacked a support system — a concern as to which mother paid little attention. Weber stated that mother needed to be committed to goals consistent with good parenting and needed to utilize supportive services and providers. Mother apparently had an ulterior motive in engaging Weber's services as she enlisted Weber's assistance in facilitating and monitoring the visitations with Eric (five visits) and, after the birth CT Page 11421 of Corey-Thomas, with both children.
Although mother continued her individual counseling at Charlotte-Hungerford with Kym Christopher, she continued to deny her need for treatment and obtained no benefit from the sessions. She continued to engage in impulsive, mood dependent behavior and was not accepting of treatment or advice. Mother told Ms. Christopher at the time of Corey-Thomas' birth that she possessed all the skills necessary to parent her children.
Mother first became involved with the Northwest Mental Health Authority in 1997 as a condition of her probation and continues at the present time to benefit from some of the services offered by this regional office of the department of mental health and addiction services, including management of her DSS (department of social services) income. Important services available to her, however, have not been utilized: mother refused counseling services and refused to see the department psychiatrist for an evaluation of the need for medication. In April 1999, when her probation terminated, mother stopped taking her prescribed Depakote, a condition of her probation, stating to a therapist that the "medication is for morons". Mother also ceased attending the women's group referring to the experience as a "bunch of baloney".
As to mother's behavior, in November 1998, she and father were arrested as a result of a violent altercation which resulted in the issuance of a protective order which mother has violated on numerous occasions. In December 1998, home supervised visits between mother and Eric were terminated when mother grabbed the child's wrist to pick him up off the floor. As a result the department switched the locale of the visits to its offices in Torrington.
Mother is obsessed with the pursuance of a relationship with father despite that relationship being characterized by emotional, physical and sexual abuse. In June 1999, one month prior to delivering her second child, mother faced eviction from her apartment as she owed $800.00 in back rent. She purchased a $300 bicycle for father's birthday. As June 25th, father's birthday, approached, mother ran up and down the street and poured hot water on her stomach in order to hasten labor so that she might deliver her child on father's birthday. When Corey-Thomas was born she told Ms. Christopher that she was so happy over the birth of her child and that it was like a dream, not because she was the mother of a new baby, but because it was Chris' baby! Mother told Mary Howard, the department caseworker, that for four years she had been trying and "I now have a L.[4] She volunteered to Michelle Pipa, her mental health worker, that she got pregnant in order to have control over father. One month after Corey Thomas was born and removed from her care amid CT Page 11422 continuing concerns by the department over mother's violent and unhealthy relationship with father and his father, mother, shunning assistance offered by Pipa, found a new apartment on her own; the upstairs tenants were father and his father! Father has stated to department personnel on several occasions that he has no desire to be involved in the life of his child, yet mother persists in pursuing the relationship.
One month after Corey-Thomas was born, Herman again evaluated mother and found that she made no progress whatsoever since his evaluation of October, 1998. In his report he concludes:
 There is nothing I have learned during my second psychiatric evaluation of Ms. H which gives me any optimism regarding her ability to parent Corey. She has a chronic psychiatric condition, a personality disorder, highly resistant to treatment. She has essentially eliminated her treatment, she lacks insight into her condition, her choices in men, or her impairments to "good enough" parenting. Her intellectual abilities and overall motivation in life seem remarkably limited. State's Exhibit 2.
The department removed Corey-Thomas from the hospital and sought the order of temporary custody in the belief that the risks to Eric H. which prevented mother from parenting him had not been addressed by mother and continued to endure at Corey's birth. One year after the removal of Eric, mother continued her chaotic lifestyle and continued in her failure to comprehend the need of her children for a stable, constant and quiet environment. State's Exhibit 4.
Despite telling Herman that she had no intention of seeing father again, mother continues to see father and even informed Weber of plans to move in with father and his father despite the fact that father resides with his pregnant girlfriend. When mother was informed of the pregnancy, she excitedly told Corey-Thomas that he would soon have another sibling.
Mother continues in her refusal to take her prescribed medication. Upon being told by Ms. Christopher in January 2000, that she would not support the return of either child to her, mother severed her relationship with the Behavioral Health Program. Ms. Christopher testified that despite an on and off three year therapeutic relationship, mother achieved no benefit therefrom, has no understanding as to the impact child care responsibilities would have on her life and continues to deny the need for any treatment; mother informed the therapist that she was in treatment due only to department pressure. CT Page 11423
Weber, who continues to monitor mother's visits with her children, likewise does not support the placement of the children with mother. She told department personnel that mother "did nothing to change the concerns that we all had". She believes that mother loves her children, but her anger at the department and her lack of cooperation with her service providers get in the way of her goals. Weber stated that although mother was receptive to some suggestions to enhance her parenting abilities, mother was secretive and chose not to share relevant information with Weber. Weber, for example, was completely unaware of the management of mother's finances by the Northwest Mental Health Authority and was quite surprised at trial to discover the extent of that agency's involvement in mother's life. Weber strongly suspected a resurgence of the relationship with father.
Mother's relationship with the mental health agency, according to Pipa, is "up and down". Having convinced mother in October 1999, to permit the agency to manage her social security income as well as her DSS income, mother withdrew her consent four months later. Mother told Sherry Hayward, mother's current department caseworker, that Pipa treats her like a child and denied that she needed any services from the mental health agency. Pipa expressed great concern as to mother's health and safety which was being compromised by mother allowing victimizers, i.e., father and father's father, into her life. Those concerns having been expressed to mother by Pipa, mother threatened to sever her relationship with the agency in November 1999.
Mother continues to visit with her children at department offices in Torrington twice a week for a total of three hours. Although the department has legitimate concerns as to mother's parenting capabilities even when people are watching (see State's Exhibit 5) this court is not overly concerned with the several incidents testified to by Hayward. During said visits mother clearly pays more attention to Corey-Thomas, tending to ignore Eric. This court is, however, greatly concerned, as is every witness in this case, as to mother's ability to provide twenty-four hour care to either or both of her young children given her continuing issues of safety, isolation, refusal to accept advice and instruction from service providers, involvement with men who continue to victimize her, anger and intellectual functioning.
Mother's relationship with the department has been evidenced by anger, hostility, resentment and defiance. She refuses to accept any suggestions offered by department personnel and has even threatened her caseworkers, her therapist and her mental health worker with restraining orders and arrest. Mother's anger-driven inappropriate behavior has been observed by this court throughout the trial. CT Page 11424
Mother's behavior prior to and subsequent to the birth of her children is consistent with Herman's Axis II diagnosis of Borderline Personality Disorder, a diagnosis with which Ms. Christopher concurred. Mother is deceitful, impulsive, irritable and her behavior is directed by rapid shifts in her mood. She will con, lie and use people. She exhibits no remorse for her mood driven behaviors and often will seek to blame others. She acts often in total disregard for her own safety and well-being and fails to appreciate the consequences of those actions. She denies the need for therapy, medication and state services. She continues to pursue unhealthy and unsafe relationships.
Herman testified that the diagnosis is most difficult to treat but, without treatment, behavior and attitude are unlikely to change. The patient must be fully committed to therapy and place trust in the therapist. In Herman's professional opinion mother's mental illness, as demonstrated by her behavior, places her childrens' safety and well-being at a high risk. She lacks the ability to employ the constant vigilance required to parent a young child, let alone two young children. Because she is not able to seek out help, or recognize the need for assistance, a child in her care may not receive needed medical treatment or emotional support.
Both children reside in the same foster home and have, according to Hayward, adjusted well to the placement. Although both are in daycare, foster mother's flexible work schedule permits her to be available to the children when needed.
IV. ADJUDICATION:
"Neglect [and uncared for] proceedings, as do termination of parental rights cases, consist of two phases: adjudication and disposition." In reDavid L., supra, 54 Conn. App. 191. In the adjudicatory phase, the court is limited to the consideration of events which preceded the filing of the neglect and uncared for petition or the latest amendment thereto. Practice Book § 33-3. This court, therefore, has considered only those events which have taken place prior to July 23, 1999, in adjudicating the two grounds of neglect alleged by petitioner as such was the date the petition was filed and said grounds were unaffected by the subsequent amendment to the petition. As to the uncared for allegations, the court will consider all those events which took place prior to November 29, 1999, as such was the date on which the amendment was filed adding those allegations to the petition. The disposition date is February 14, 2000 which was the last date on which evidence was presented.
A. The Neglect Allegations — Predictive Neglect
CT Page 11425
(1) The Parties' Positions
Petitioner argues that Corey-Thomas is at significant risk of emotional and/or physical harm due to mother's lack of insight as to her mental illness and her risk-taking behavior, in particular, her continuance of a relationship with father which is characterized by violence and abuse. Petitioner also stresses mother's unwillingness to make productive use of the various services available to her. Petitioner argues that the evidence clearly demonstrates that there has been no change in mother's parenting deficiencies since Eric was removed from her care more than two years ago. Petitioner, citing such cases as In re Kelly S.,29 Conn. App. 600 (1992) and In re Genesis A. (Keller, J.) dated May 2, 1996, urges this court to find that Corey-Thomas is a neglected child based upon the legal principle of "predictive neglect". Petitioner asks this court to find that mother's parental deficiencies resulting from her mental illness and demonstrated by her behavior subsequent to the removal of one child provide the basis for a valid and reasonably probable concern that mother could not discharge the parenting duties required to parent Corey-Thomas. Petitioner asks the court to find, therefore, that if returned to mother's care, said child would be denied proper care and attention physically, educationally, emotionally or morally and that said child would be permitted to live under conditions, circumstances or associations injurious to his well-being.
The child's attorney strongly supports petitioner's position and argues that mother's character traits preclude her from safely parenting her children. Counsel argues that the evidence reveals that mother is "inconsistent, contradictory, impulsive, risk-taking, confrontational, unstable and lacking in good judgment and insight". Counsel for Corey-Thomas urges mother to confront her own mental health needs before she can expect to be in a position to meet the emotional, physical and mental needs of said child.
Mother, through her attorney, argues that petitioner has not properly pleaded a case of predictive neglect and has produced insufficient evidence to meet her burden of proof. Mother, therefore, urges this court to dismiss the petition, vacate the order of temporary custody and return Corey-Thomas to her care. Mother correctly points out that the allegations of neglect contained in the petition, as amended, are confined to the present tense as evidenced by the use of the verb "is" in reference to the alleged lack of proper care and attention and in reference to the alleged living conditions, circumstances and associations. Mother argues that since Corey-Thomas was not permitted to leave the hospital with her, he was never in her care, thus petitioner's allegations of present neglect and present lack of care are incapable of CT Page 11426 being proven. Mother also correctly points out that petitioner has not filed a motion to conform the pleadings to the proof as is permitted by Practice Book § 10-62. Mother offers that, at best, all the petitioner has shown through the testimony and documentary evidence is the existence of "possibilities" of neglect and "possibilities" that Corey-Thomas might be at risk if returned to his mother. These "possibilities", mother argues, fall far short of the burden of proof imposed upon petitioner, i.e., proving neglect by a fair preponderance of the evidence.
(2) Legal Analysis
Two of the cases cited by petitioner aptly describe the nature of and necessity for the doctrine of predictive neglect. The Appellate Court in the case of In re Kelly S., supra, 29 Conn. App. 615, cites with approval the finding of the trial court that the law will not "require this child to be placed in the custody of parents who clearly are and will be incapable of providing even basic care for her let alone the specialized care that [she] needs, for the sole purpose of demonstrating that she will suffer actual harm."[5] In the trial court decision in the case of In re Genesis A., supra, Judge Keller writes: "It is neither consistent with statutory construction and case law, nor reasonable, to prevent a judge from protecting an unharmed child if harm is reasonably predictable." (Page 13).
The trial court memorandum of decision authored by Judge Goldstein in the case of In re Joey and Anthony C. issued in Plainville on November 5, 1992, is replete with citations from court's in other jurisdictions which have adopted the doctrine; the Massachusetts Supreme Court held that:
 The state interest in protecting neglected children may properly be preventative as well as remedial. The Court need not wait until it is presented with the maltreated child before it decides the necessity of care and protection. Rather an assessment of prognostic evidence derived from an ongoing pattern of parental neglect of misconduct is appropriate in the determination of future fitness and the likelihood of harm to the child. Thus in these circumstances Court intervention is appropriate to protect the child who although not yet maltreated is a probable victim of parental neglect. (Page 31).
In re Custody of a Minor Child, 210 N.W.2d 907, 910 (S.A. 1973). Citing the public policy embodied in General Statutes § 17a-101[6], Judge CT Page 11427 Goldstein concluded that state intervention in order to prevent the neglect or abuse of a child is statutorily permissible. "To interpret [the] [statute][7] to be restrictive or reactive in nature only and not allowing for proactive state intervention to protect an as yet unharmed child[ren] would contradict all common sense." (Page 35).
Applicable to the issues presented by the facts of this case and instructive on the doctrine of predictive neglect is the trial court's (Brenneman, J.) memorandum of decision in the case of In re Jessica R. which was decided upon a coterminous petition and issued on June 8, 1990, in Plainville. The court cites with approval the following from Inre William B., 533 A.2d 16 at 21 (Md.App. 1987):
 The parents' ability to care for the needs of one child is probative of their ability to care for other children in the family.. .The judge need not wait until the child suffers some injury before determining that he is neglected.
It is within the framework of the cases cited that the Appellate Court very recently and very clearly proclaimed the existence of the doctrine of predictive neglect in Connecticut law. In the case of In re MichaelD. et al., 58 Conn. App. 119 (issued June 5, 2000), Judge Mihalakos, with all three of the other judges concurring, stated that:
 Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been
affected. The commissioner need not show, but need simply allege, that there is potential for harm to occur An adjudication of neglect may be based on a potential risk of harm and not just actual harm. (Citing In re Kelly S., supra, 29 Conn. App. 612), at pages 124 and 125.
Emphasis added.
Mother, in her brief, cites several earlier trial court decisions which appear to question the applicability of the doctrine of predictive neglect to the facts of each case in particular and to Connecticut law in general[8]. Mother also cites the case of In re Jonathon P.. et al., 1999 WL 732696 (Conn.Super.) decided by Judge Resha on September 3, 1999, however, that decision clearly recognized the existence of the doctrine at page 3 where, in discussing the child's emotional and educational needs, the court points out as "established law that the CT Page 11428 court need not wait until actual damage or injury to the children has occurred before it has the responsibility to act on their behalf." Emphasis added.
In light of the Appellate Court's decision In re Michael D., supra, mother appears to concede that the doctrine is now Connecticut law, however, mother argues that by pleading in the present tense, petitioner has not properly invoked the doctrine. This court must disagree with mother. As petitioner correctly points out, she is powerless to alter the language contained in General Statutes § 46b-120 (8)(B) and (C) which employs the present tense in defining a neglected child. Reference to said statute is mandated by Practice Book § 32-1(a) which also requires petitioner to state, with particulars, the specific conditions which have precipitated the filing of the petition. Those particulars are contained in petitioner's Summary of Facts which is incorporated into the petition by reference pursuant to Practice Book § 32-1(b). All petitions invoking the jurisdiction of this court are to be liberally construed in the best interest of the child whose welfare is at issue. Practice Book § 35-1(a). Practice Book § 35-1(c) provides a liberal petition amendment policy even allowing the court, on its own motion, to amend a petition "at any time". In courts having general jurisdiction the policy throughout our state" is to read pleadings broadly and realistically, rather than narrowly and technically".DeMartin v. Yale — New Haven Hospital, 4 Conn. App. 387, 390, cert. denied, 197 Conn. 813 (1985); Grigerik v. Sharpe, 56 Conn. App. 314,318 (2000). The petition cites mother's psychiatric history, her stalking and harassing criminal activities and her involvement with dangerous males. The petition alleges that mother's history portends an inability to parent a new born child and to provide for the care and safety which an infant requires. The petition and the summary of the facts incorporated therein liberally interpreted in light of the best interest of Corey-Thomas allege with appropriate specificity a potential risk of harm to said child if mother was to assume responsibility for his care. The allegations are sufficient, if proven, to establish a case for a finding of predictive neglect.
(3) The Court's Findings
After considering all of the evidence this court finds that petitioner has proven by a fair preponderance of the evidence that as of July 23, 1999, Corey-Thomas was a neglected child as defined by each of the grounds alleged, in that said child was at risk of enduring physical or emotional harm by virtue of mother's chaotic and dangerous lifestyle, psychiatric history and parenting deficiencies. That risk remained as of November 29, 1999, the date of the amended petition, and continues as of this date. Despite having her first child removed, mother continued to CT Page 11429 ignore professional recommendations and court-ordered steps and gave birth to a second child amid the same concerns which prompted state action one year earlier. She continued to deny the need for treatment and has received no benefit from therapy or parenting classes. She ceased taking prescribed medication and refused to see a psychiatrist. She continued her obsessive and dangerous relationship with Christopher L. resulting in the birth of Corey-Thomas — a father who has professed no desire to have any relationship with his son. After Corey's birth and removal, a second evaluation by Herman found no progress in mother's ability to parent. The risk to Corey was as prevalent as was the risk to Eric one year prior.
The court's findings are not based solely upon the risk perceived, testified to and documented by Herman, but are substantially based upon credible testimony and documentation as to mother's performance, or rather, lack thereof, from Eric's birth to that of Corey. The court however, in according proper weight to Herman's testimony, considers his opinions to have been based upon reasonable medical probability. Although mother argues that Herman's opinions were speculative and based upon mere possibilities, mother made no attempt to question the witness on this point. Herman was ordered by the court to conduct the evaluations of mother and was called by petitioner and qualified as an expert witness. See In re Theresa S., 196 Conn. 18, 28 (1985). Herman's concerns as to the risk of harm to Corey-Thomas have been proven justified by mother's own performance during the one year interval between the birth of her sons. The final proof of the correctness of Herman's predictions is found in the results.
B. The Uncared For Allegations
Petitioner argues that Corey-Thomas is an uncared for child in that he is homeless and in that his home cannot provide the specialized care which his physical, emotional and mental condition requires. Petitioner, citing, In re Carl O., 10 Conn. App. 428 (1987), cert. denied,204 Conn. 802 (1987), asserts that, as of November 29, 1999, the adjudication date on this issue, Corey-Thomas was a four-month old infant and was dependent on his adult caretakers to provide for all of his needs. Petitioner, citing, In re Kelly S., supra, 29 Conn. App. 600, argues that mother was incapable of satisfying Corey's needs and her home was inadequate in light of her parental mental deficiencies. Mother counters that no evidence was produced of one instance of actual neglect by mother as mother never had custody of Corey-Thomas. Mother further asserts that any evidence presented showing that mother would not be able to fulfill an infant's needs was speculative, at best. That assertion has been previously addressed in this court's findings relative to the allegations of neglect. CT Page 11430
It is interesting to note that in two of the cases cited by mother in her brief as precedent for the non-applicability of the doctrine of predictive neglect, the trial courts had no difficulty finding that the "uncared for" allegation was proven — proven on facts which led each court to dismiss the neglect allegations. In re Jocelvna N., In reRomance M.. Allan D., Jr. (see footnote 8.).
As of November 29, 1999, mother found and had appropriately fixed-up and child-protected an apartment adequate for her children's special needs, however, the apartment was located downstairs from that occupied by individuals who continued to physically and sexually abuse mother. Judge Brenneman had occasion to address this issue in the case of In reValerie M., 1990 WL 269197 (Conn. Super, 1990). She stated, at page 8:
 Furthermore, even if they had secured an apartment, the child would continue to be homeless until such time as either parent demonstrated an ability to provide consistent, stable, responsible nurture to an infant. Home for a baby does not equate with "house". Children need not only adequate physical space but also, within that space, a caretaker reasonably predicted to be able to provide adequate physical and emotional care.
This court finds that as of November 29, 1999, Corey-Thomas was homeless and was, therefore, an uncared for child. As of that date, mother lacked the ability to provide a stable, nurturing and safe environment for Corey-Thomas. She persisted in her refusal to take her prescribed medication, her denials of her need for intensive therapy and her obsessive and dangerous behaviors. As of that date mother lacked the skills necessary to parent her infant child and to satisfy his special needs by virtue of his infancy. As of that date mother had made no progress in her ability to appropriately and safely parent a four month old baby as for over a period in excess of one year she had failed to address the concerns for safe parenting expressed by therapists, social workers, and mental health professionals. This court finds that petitioner has proven by a fair preponderance of the evidence that, as of November 29, 1999, Corey-Thomas was an uncared for child under the homeless and specialized care aspects of the statutory definition.
V. DISPOSITION:
Mother's impulsive, mood-driven, risk-taking behaviors, her refusal to access and benefit from recommended essential services and her obsession with pursuing and maintaining relationships which pose a danger to her CT Page 11431 and her children, have now resulted in an adjudication of uncared for relative to Eric H. and of neglect and uncared for relative to Corey-Thomas. Eric H. has been committed to the department for two years and is currently the subject of a termination of parental rights petition. It is most assuredly in the best interest of Corey-Thomas that he also be committed to the care and custody of the department which has been responsible for his welfare for over a year by virtue of the order of temporary custody. A permanency plan is statutorily overdue. General Statutes § 46b-129 (k)(1). Time is running out for mother given the state and federal statutory mandates and Corey's need for a safe and nurturing permanent home. It is imperative for mother to recognize her need for medication, intensive therapy, and multilevel services from the department of mental health and addiction services. It is imperative that she immediately access the services available to her, including parenting and anger management programs. It is imperative that she sever all contact with Christopher L. and his father and seek out an appropriate adult as a source of moral and therapeutic support. It is imperative that mother supplant her denial, anger and obstinance with acceptance, cooperation and commitment to her son's welfare as her top priority.
VI. CONCLUSION
After carefully examining the exhibits introduced into evidence, after carefully considering the testimony of each witness and reading the briefs submitted by counsel, this court concludes and finds that:
(1) Corey-Thomas is a neglected child;
(2) Corey-Thomas is an uncared for child;
 (3) It is in the best interest of Corey-Thomas that he be committed to the care and custody of the commissioner of children and families for the maximum statutory period;
 (4) Effective upon said commitment, the order of temporary custody shall be vacated.
VII. ORDERS:
Based upon the foregoing findings, it is:
ORDERED that Corey-Thomas is hereby adjudicated a neglected and uncared for child;
ORDERED that effective on the filling of this memorandum, the order of CT Page 11432 temporary custody entered on July 23, 1999, is hereby vacated and said child is hereby committed to the commissioner of children and families for the maximum period of twelve months;
ORDERED that an in-court review shall be held on a date to be set by the court services officer who shall, prior thereto, in consultation with counsel for mother, father, child and petitioner, prepare steps pursuant to § 46b-129 (j), said steps to be ordered by the court in the presence of the parents;
ORDERED that at the time of said in-court review, the court will set specific dates to assure compliance with applicable statutes relative to permanency planning.