ZAGER, Justice
(dissenting).
I respectfully dissent. The majority’s review of the record is thorough, so I will recount it only as necessary. However, I disagree with the majority’s conclusion N.S. and J.S. are not children in need of assistance under Iowa Code section 232.2(6)(6) (2013).
This court has rarely had the opportunity to apply the different provisions of Iowa Code section 232.2(6), under which a child may be adjudicated CINA because the child is “imminently likely” to be the victim of abuse or neglect. We have done so in only two cases, In re D.D. and In re A.M.H. See generally In re D.D., 653 N.W.2d 359 (Iowa 2002); In re A.M.H., 516 N.W.2d 867 (Iowa 1994). In those cases, we found specific prior instances of sexual or physical abuse supported the finding the children were “imminently likely” to be neglected or physically or sexually abused.
*45 However, I do not believe we should let the specific facts at issue in those cases control the resolution of this case. Nothing we said in those cases indicated that a lack of specific previous instances of abuse or neglect foreclosed a CINA adjudication on the basis that a child was imminently likely to be abused or neglected. Moreover, the plain language of section 232.2(6)(6) does not require the State to prove the occurrence of specific previous incidents of abuse or neglect to show the risk of future abuse or neglect. See Iowa Code § 282.2(6)(6). Nor should the State be required to prove that abuse or neglect has already occurred before acting to protect children under these statutes. As the majority notes, child protection statutes “are designed to prevent probable harm to the child and do not require delay until after harm has occurred.” In re L.L., 459 N.W.2d 489, 494 (Iowa 1990); see also Iowa Code § 232.1 (requiring liberal construction of child protection statutes to serve children’s welfare).
I would conclude, after a de novo review of the record, there was clear and convincing evidence showing Ashley was imminently likely to abuse or neglect N.S. and J.S. were the children returned to her care. This conclusion is based upon more than the mere classification of Ashley as a methamphetamine addict and the excerpt from Petithory contained in the DHS report. See State v. Petithory, 702 N.W.2d 854, 857-58 (Iowa 2005).
The record tells the story of Ashley’s continued inability to parent her children due to her unabated drug use. Ashley has relapsed multiple times since the children were removed from her care in Nebraska in 2011. Even after DHS became involved in Iowa, she continued her drug use and tested positive for multiple drugs twice since April 2013. The hair-follicle test conducted in May found the presence of methamphetamine at 7890 picograms per milligram. Ashley did not dispute the State’s claim that this amount is consistent with daily use. Throughout these proceedings, Ashley continually denied using and minimized her drug use. In mitigation, Ashley claims that she never used drugs in front of her children or while she was responsible for their care. In July, Ashley commenced out-patient drug treatment. However, in a progress report dated August 22, it was noted that “Ashley has made little to no progress in the last 30 days. Ashley admitted to services on July 9, 2013, and has been present 8 out of 26 days scheduled for group.” The progress report also noted that a drug test on August 14 was positive for methamphetamine, amphetamine, and opiates, although Ashley denied using any opiates. This report is dated eight days before the scheduled adjudication hearing.
As the drug tests reveal, Ashley used not only methamphetamine but also other drugs. In addition to methamphetamine, she was also variously ingesting amphetamine, cannabinoids, carboxy-THC, and opiates. The use of multiple controlled substances paints a picture of an individual who will ingest anything available to get high. Ashley was simply not capable of stopping her usage of drugs until she entered inpatient treatment.
The record also reveals that without the discipline provided by inpatient treatment, Ashley was incapable of avoiding the use of drugs. Ashley had previously completed inpatient drug treatment in September 2012. The apparent impetus for Ashley entering treatment on that prior occasion was, like in this case, the removal of her children from her care. According to Ashley’s mother, Barbara, Nebraska child welfare authorities removed N.S. and J.S. from Ashley’s care because of her drug addiction. Ashley reported relapsing six *46 months after completing treatment, though Barbara believed Ashley relapsed as soon as two months after completing treatment. Regardless of when Ashley relapsed, it is clear she did so after leaving the supervision of treatment. This history of use followed by treatment, abstinence, and relapse indicates more than a prolonged struggle with drugs. It portends future relapse, future drug abuse, and future treatment, and thus more risk and disruption to her children. Cf. L.L., 459 N.W.2d at 494 (noting a parent’s past is a consideration in child protection cases because that past performance may indicate future capabilities).
Without profound change, Ashley’s past indicates that she will again abuse methamphetamine. This makes especially relevant a portion of the DHS report. According to the report, which takes its language from Petithory, “ongoing methamphetamine use” hinders reasoning ability, causing users over time to lose their “capacity to function on a daily basis because of a lack of comprehension of what the risks in the environment [are], [and] what the children’s needs on a day-to-day basis [are].” It is not merely speculation or conjecture that Ashley’s daily methamphetamine use likely has diminished her reasoning ability, which impairs her ability to care for N.S. and J.S.
Evidence suggests Ashley’s use causes her other behavioral problems that put her children at risk as well. The DHS child protection worker reported Ashley behaved erratically during an interview. Ashley laughed, cried, and displayed anger, which, the child protection worker noted, could have been caused by Ashley’s methamphetamine use. When Ashley reported that same day for a drug test, drug test facility workers described Ashley as “scattered,” which led them to believe she was under the influence of drugs, even though Ashley claimed to have used a week earlier. Subsequent drug testing confirmed the inaccuracy of Ashley’s representation.
Ashley’s behavior during the interview and in front of the testing facility workers indicates the sort of erratic, perhaps careless, behavior to which she could subject her children. Moreover, Ashley’s displays discredit her claims that after relapsing in March she used methamphetamine rarely before beginning to use each day sometime in July. As the State suggests, there would not have been such a high concentration of methamphetamine in her system were Ashley only an infrequent user. Importantly, contrary to what Ashley claims, she may have relapsed before March. Barbara believed Ashley may have resumed using in November 2012, just two months after completing a prior placement in residential drug treatment. Ashley, we may safely conclude, concealed the full extent of her drug abuse.
In spite of Ashley’s early drug abuse, the record indicates N.S. and J.S. were receiving adequate care. In fact, Barbara reported that N.S. and J.S. were in good health; the DHS report indicated Ashley was “meeting the physical needs of the children.” The report also describes Ashley’s residence as “clean” and “appropriately furnished.” The child protection worker observed Ashley combing J.S.’s hair and dressing her. She described Ashley as “very nurturing.” However, it must also be acknowledged that N.S. was already in the full-time care of Barbara, and J.S. followed shortly thereafter.
I do not doubt that in times of sobriety Ashley may be a capable mother. But as noted, Ashley has to this point struggled to maintain sobriety. When she is under the influence, or descending from a high, she subjects N.S. and J.S. to the risk of being abused or neglected. As the report noted, *47 J.S. is particularly vulnerable to mistreatment, being just four years old at the time of the report. Cf. D.D., 653 N.W.2d at 361-62 (concluding father’s past sexual conduct with his daughter and son’s vulnerability supported adjudication of the son as a child in need of assistance).
Moreover, much of the children’s good health can be attributed to Barbara, with whom both children were staying much of the time due to Ashley’s drug use and living arrangements. Notably, Barbara indicated N.S. and J.S. were due for a doctor’s appointment. In addition, Barbara told the child protection worker she had “secured daycare for the children.” These statements suggest Barbara had already assumed much of the children’s care. We long ago held a child who does not receive proper care from his or her parent is a neglected child, even if a grandparent provides excellent care to the child. See State ex rel. Gering v. Bird, 250 Iowa 730, 732, 736-37, 96 N.W.2d 100, 101, 103-04 (1959) (affirming a juvenile court’s finding that a child was a “neglected child” in relation to her father even though the child had been well cared for by her grandparents).
In this regard, I disagree strongly with the majority’s suggestion that a parent afflicted with drug addiction might avoid having his or her children adjudicated CINA by passing off the children to a relative. In Ashley’s case, the availability of her mother and stepfather to care for N.S. and J.S. undoubtedly protected the children from the worst effects of Ashley’s addiction; however, it also enabled her to go right on using methamphetamine. Combined with the apparent frequency of Ashley’s drug use, one could easily conclude that Ashley’s motivation in voluntarily turning over her children to her parents was to make using methamphetamine easier.
The fact a parent has been a drug addict or alcoholic is not alone a sufficient basis for adjudicating a child as a child in need of assistance. J.B.M. v. Dep’t of Children & Families, 870 So.2d 946, 951 (Fla.Dist.Ct.App.2004) (concluding that without an actual harm or injury “as a consequence of a parent’s alcohol or drug use, evidence that the parent has a drug or alcohol problem, standing alone, is insufficient to support a finding of dependency”); In re William B., 73 Md.App. 68, 533 A.2d 16, 19 (1987) (“Mere alcoholism of the parents is not grounds under the statute for removing a child from his home with his parents.”); In re Children of T.R., 750 N.W.2d 656, 663 (Minn.2008) (holding “substance or alcohol use alone does not render a parent palpably unfit” to parent); Cf. In re A.M., 843 N.W.2d 100, 111 (Iowa 2014) (observing “that a parent’s ‘lower mental functioning alone is not sufficient grounds for termination.’ ” (quoting In re D.W., 791 N.W.2d 703, 708 (Iowa 2010))). In contrast, in this particular case, at the time of the adjudication hearing, Ashley was an active, untreated methamphetamine user.
On a related note, appellate review in this case was complicated by the terse adjudication order. Legal analysis in CINA determinations is particularly important to the appellate courts given the undeniable expertise of juvenile judges in handling these difficult cases. For that reason, and a host of others, juvenile courts are reminded that when there are contested grounds for adjudication before it, appellate review is much more effective with the benefit of the juvenile court’s full, fair, and adequate explanation of its legal conclusions. See Iowa Code § 232.96(7) (“After the hearing is concluded, the court shall make and file written findings as to the truth of allegations of the petition and as to whether the child is a child in need of assistance.”). This ensures courts at all *48 levels are acting in the children’s best interests.
In sum, I would conclude, after a full review of the record, the State proved by clear and convincing evidence that N.S. and J.S. were children in need of assistance under Iowa Code section 282.2(6)(6), as Ashley was imminently likely to abuse or neglect the children. Each time Ashley climbs up from addiction, only to descend again, she disrupts her children’s lives. Her drug abuse jeopardizes their health, safety, and welfare. As we have said in the context of parental rights termination, “Children simply cannot wait for responsible parenting.” L.L., 459 N.W.2d at 495. Toward that end, we have explained “that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children.” In re A.B., 815 N.W.2d 764, 776 (Iowa 2012). I would vacate the decision of the court of appeals and affirm the order of the juvenile court in its entirety.
CADY, C.J., joins this dissent.